The STATE of Ohio, Appellee,

v.

STOUDEMIRE, Appellant.

[Cite *State v. Stoudemire* (1997), 118 Ohio App.3d 752.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 69335.

Decided March 10, 1997.

754

*Stephanie Tubbs Jones,* Cuyahoga County Prosecuting Attorney, and *Christopher L. Frey,* Assistant Prosecuting Attorney, for appellee.

*David L. Doughten,* for appellant.

PATTON, Judge.

A jury found defendant Michael Stoudemire guilty of one count of aggravated murder, with a firearm specification. In this appeal he raises four assignments of error that challenge (1) the sufficiency of the evidence, (2) discovery violations, (3) the jury instructions, and (4) the weight of the evidence.

The state's evidence showed the decedent, Osceola Jones, died of multiple gunshot wounds. The fatal shot entered from his right back, at a distance of more than six to twelve inches, but less than two and one-half to three feet.

The night before his death, decedent patronized a local bar. The bar was particularly crowded that evening because it featured discount drinks, and a line of patrons, including defendant, formed outside the door awaiting admittance. A fight broke out between defendant and others waiting in line. Decedent left the bar and tried to break up the fight. Eventually, the police arrived and the participants scattered.

Later that evening, decedent's best friend stopped by defendant's house, apparently to make peace between defendant and decedent. The best friend suggested that defendant "leave it alone" because they all lived too close to each other to carry ongoing animosity. Defendant refused, saying he had "to do something."

The following morning, a beverage store clerk at a local mall saw defendant approach decedent in an aisle of the store. Although she could not hear the conversation, the clerk refused to characterize it as a friendly conversation because the parties were speaking in low voices and decedent appeared to be trying to avoid the conversation by walking away from defendant. The clerk turned her attention to other matters and did not actually see either defendant or decedent leave the beverage store, although she did see them walking together in the mall area of the shopping center moments later. The clerk stated that she watched the two men walking away because she found it unusual that decedent would leave the store without saying goodbye.

The shopping mall owner testified that he had been working behind the mall when he heard three or four gunshots. He then saw defendant, whom he knew, walk "briskly" around the building toward a car that pulled into a nearby driveway. The mall owner saw the occupants of the car speak to defendant and heard one of them ask defendant, "Why did you do that?"

The occupants of the car testified that they turned into a driveway just yards from the beverage store when they heard three shots. They ducked back inside the car and saw defendant running around the corner with a firearm in his hand. The passenger recognized defendant and asked what happened. Defendant

replied, "Go check your boy, you'll see what happened." The driver gave similar testimony, but stated that defendant said, "I just popped your nigger, go see."

The police subsequently located defendant and arrested him for questioning. Defendant told the police that he had no quarrel with decedent—decedent had, in fact, assisted him during the bar fight the night before. However, defendant told the police that he had seen decedent the following day at the beverage store and asked him why he struck him at the bar.

Defendant testified and corroborated much of the evidence, but denied shooting decedent. He stated that a scuffle occurred at the bar when someone tried to jump ahead in the line. When he finally did enter the bar, someone smashed a hard object over his head and knocked him off his feet. Decedent helped defendant to his feet and told him to stand in place so he would not be struck again. Defendant further admitted that decedent's best friend visited that night to tell him not to retaliate, and in response he said, "Whatever." Defendant said that as of that moment he had no problems with decedent.

Defendant further admitted seeing decedent the following day at the beverage store. He asked decedent why he had been jumped, and decedent replied that he did know and did not want to talk about it. Defendant said that he walked out of the store and left decedent. He went to the back of the mall to relieve himself and heard gunshots. He turned the corner and saw the mall owner, gave greetings and continued walking. He then saw the two occupants of the car. They asked him what happened, and he told them he did not know, that he heard something. Defendant said that they went to investigate and he continued on his way. He denied carrying a weapon.

## I

The first assignment of error complains that the state failed to present evidence of prior calculation and design sufficient to sustain a conviction for aggravated murder. He maintains that something more than a sudden intention to kill is required—that a studied scheme or plan must be proven from the evidence, and the state failed to establish just such a scheme or plan.

R.C. 2903.01(A) states, "No person shall purposely, and with prior calculation and design, cause the death of another." The term "prior calculation and design" is not defined by the Revised Code, but is generally understood to encompass the calculated decision to kill. *State v. Robbins* (1979), 58 Ohio St.2d 74, 12 O.O.3d 84, 388 N.E.2d 755, paragraph one of the syllabus. Instantaneous deliberation is insufficient to constitute prior calculation and design. *State v. Cotton* (1978), 56 Ohio St.2d 8, 10 O.O.3d 4, 381 N.E.2d 190, paragraph two of the syllabus. But the amount of care and the length of time the offender takes to

ponder the act are not critical factors in themselves in determining prior calculation and design. *State v. O'Neal* (Sept. 22, 1994), Cuyahoga App. No. 65260, unreported, at 14, 1994 WL 520386, citing Legislative Service Commission Comment to R.C. 2903.01.

■ Prior calculation and design may be shown by evidence revealing the presence of sufficient time and opportunity for planning the act of homicide. *Robbins, supra; Cotton, supra,* at paragraph three of the syllabus. The state presented substantial evidence upon which the jury could conclude that all the elements of aggravated murder had been established beyond a reasonable doubt. *State v. Eley* (1978), 56 Ohio St.2d 169, 10 O.O.3d 340, 383 N.E.2d 132, syllabus.

■ The evidence suggested that defendant intended to retaliate against decedent. When decedent's best friend spoke to defendant the evening before the murder and asked him to drop the matter, defendant refused, saying he had "to do something." The following day, witnesses saw defendant speaking with decedent. The jury heard testimony that decedent clearly did not wish to speak with defendant and tried to leave, but that defendant was seen walking with decedent. Shortly thereafter, other witnesses stated that they saw defendant shortly after hearing gunshots and defendant told them to "see your boy."

Defendant argues that the location of the shooting (near the beverage store) and the timing of the shooting (in broad daylight) tend to show "not much in the way of design" by defendant. In effect, he maintains that the circumstances of the killing were so poorly thought out that no rational person would have premeditated them.

The absence of foresight does not necessarily prove the lack of a coherent plan to murder a person—there is such a thing as a bad plan. One could also conclude that defendant simply did not care who saw him commit the murder, or possibly that he intended that others know he committed the murder. Defendant himself raised the specter of gang violence motivating the fight occurring the previous evening, so it is not inconceivable that the murder occurred as retaliation. A witness quoted defendant as saying he had to do something as a result of the brawl. His subsequent actions, poor judgment and all, could lead a reasonable trier of fact to find he took a firearm, sought out decedent, and killed him. The first assignment of error is overruled.

## II

In his second assignment of error, defendant complains that the trial court erred by permitting a police detective to testify that defendant told her that he did not hear gunshots while at the mall. The defense complained that the state failed to mention this statement in discovery, and the state now concedes that it

failed to produce a written summary of this aspect of defendant's oral statement. The issue is whether the trial court abused its discretion by permitting the statements to be entered into the record.

Crim.R. 16(B)(1)(a)(ii) requires the state to provide written summaries of any oral statements made by the defendant to any law enforcement officer. When faced with a violation of this rule, the trial court has a certain amount of discretion in determining the sanction to be imposed. It is under no obligation to exclude the material from trial. *State v. Parson* (1983), 6 Ohio St.3d 442, 445, 6 OBR 485, 487–488, 453 N.E.2d 689, 691–692. It should inquire into the circumstances surrounding the discovery violation and, if it determines sanctions are appropriate, must impose the least severe sanction that is consistent with the purpose of the rules of discovery. *Lakewood v. Papadelis* (1987), 32 Ohio St.3d 1, 511 N.E.2d 1138, paragraph two of the syllabus; *State v. Soke* (1995), 105 Ohio App.3d 226, 245, 663 N.E.2d 986, 998–999. "The court does not abuse its discretion in admitting evidence undisclosed in discovery unless the record shows that the prosecutor's discovery violation was willful, that foreknowledge would have benefited the accused in preparing his defense, or that the accused was unfairly prejudiced." *State v. Otte* (1996), 74 Ohio St.3d 555, 563, 660 N.E.2d 711, 720.

Despite the state's discovery violation, we find that the trial judge did not abuse his discretion by refusing to strike the detective's testimony. First, the record does not suggest that the state willfully committed the violation. Indeed, the state appeared genuinely surprised by the detective's testimony, attributing the statement about not hearing the gunshots solely to the detective's recollection. Second, it is unclear just how prior knowledge of the statement would have benefited the defense. Defendant offers nothing specific, other than to say that the statements were essential for trial preparation. This is an inadequate showing. Third, we find no prejudice. Defendant admitted being in the immediate vicinity of the offense, and two witnesses testified that he approached them just after the shots were fired, carrying a firearm. We can only guess that defendant would have used the statement to try to show that he departed the scene well before the shooting, but that would have been a dubious theory in view of the overwhelming testimony that placed him on the scene. The second assignment of error is overruled.

## III

The third assignment of error raises several challenges to the jury instructions. Defendant complains that the instructions inadequately charged the jury on (a) causation, (b) the presumption of purpose from the use of a deadly weapon, and (c) specific intent. He did not raise any objections to the charge, so

we deem these errors waived and proceed under a plain error analysis. Crim.R. 52(B); *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804. "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.* at paragraph three of the syllabus.

## A

Defendant first argues that the trial court's jury instruction on causation transformed the specific intent required to commit murder into something less than specific intent.

The trial court gave essentially the same instructions as those in *State v. Jacks* (1989), 63 Ohio App.3d 200, 578 N.E.2d 512. The instructions, taken from 4 Ohio. Jury Instructions ("OJI") (1981) 69–70, Section 409.56, stated:

"The causal responsibility of the defendant for an unlawful act is not limited to its immediate or most obvious result. He is responsible for the natural, logical and foreseeable results that follow in the ordinary course of events from an unlawful act.

"The test for foreseeability was not whether the defendant should have foreseen the injury in its precise form or as to a specific person, the test is whether a reasonably prudent person in light of all the circumstances would have anticipated that the death was likely to result to anyone from the performance of the unlawful act."

This instruction is not recommended in charging a jury on murder because, although addressed to causation, it may undercut the *mens rea* requirement for murder. *Jacks, supra*, 63 Ohio App.3d at 205, 578 N.E.2d at 515. Nevertheless, the instructions must be viewed as a whole and will not be reversed if they, in their entirety, "make clear that the jury must find purpose to kill in order to convict." *State v. Phillips* (1995), 74 Ohio St.3d 72, 100, 656 N.E.2d 643, 668, citing *State v. Burchfield* (1993), 66 Ohio St.3d 261, 262–263, 611 N.E.2d 819, 820–821.

*Burchfield* considered precisely this issue and found that the instructions issued in that case differed significantly in whole from those used in *Jacks* because (1) there were extensive instructions regarding purpose given prior to the causation instruction and (2) the court reiterated the purpose instruction immediately following the causation instruction.[1]

---

1. The court's discussion in *Burchfield* is arguably dicta because the court actually dismissed the appeal and did not reach the certified question. This point is further demonstrated by the speculative language the court used when it noted that the inclusion of the jury instruction

■ These same considerations lead us to conclude that the instructions given in this case, as a whole, adequately instructed the jury that it could convict only upon a showing of purposeful behavior. As in *Burchfield,* the trial court instructed the jury on purpose before instructing on causation. Likewise, the trial court instructed the jury that it could infer purpose from the use of a deadly weapon. Finally, the evidence would not reasonably have permitted the jury to find that defendant acted with any mental state other than to purposefully kill decedent. The coroner testified that the victim had been shot five times, with the fatal bullet entering in the lower back from very close range. Defendant denied shooting decedent, so he presented no evidence suggesting that the murder had been committed either knowingly or recklessly. Under these circumstances, we are unable to find that the instruction on causation prejudiced defendant to the extent that plain error resulted.

## B

Defendant next complains that the trial court provided the jury with an instruction that created an unconstitutional mandatory or conclusive presumption. The court instructed the jury:

"If a wound is inflicted upon a person with a deadly weapon in a manner calculated to destroy life, the purpose to cause death may be inferred from the use of the weapon."

■ In *State v. Montgomery* (1991), 61 Ohio St.3d 410, 575 N.E.2d 167, the court upheld the validity of this instruction. The court found that the words "may be" modified the word "inferred" to such an extent that "[n]o reasonable jury could have felt compelled to presume intent on the basis of the trial judge's instruction." *Id.* at 415, 575 N.E.2d at 172; see, also, *State v. Taylor* (Nov. 9, 1995), Cuyahoga App. No. 65711, unreported, at 23–24, 1995 WL 663267. We find no plain error in this instruction.

## C

Defendant's final argument dovetails with his argument in Part I(A), above, namely, that the trial court's instruction on specific intent was diluted by another instruction telling the jurors that "[s]pecific intent is no more nor less than a particular intent proscribed by statute."

---

language "would have made the question closer than it need have been." *Id.* at 263, 611 N.E.2d at 821. However, *Phillips* subsequently approved (without further elaboration) the reasoning in *Burchfield,* so we conclude that the analysis employed in *Burchfield* has precedential effect.

■ We are unsure just how this instruction would have diluted the require-ment of specific intent as argued by defendant, but we find that a complete reading of the trial court's instructions shows them to accurately encompass the law. The instructions stated:

"No person may be convicted of aggravated murder unless he is specifically found to have intended to cause the death of another.

"Specific intent is no more nor less than a particular intent proscribed by statute. This statute mandates that the jury must find the killing must have been done purposefully and with specific intent and that the defendant specifical-ly intended to produce the death of [decedent]."

The trial court twice told the jurors that they could convict only upon a finding that defendant specifically intended to cause decedent's death. This instruction clearly set forth the law; there is no plain error. The third assignment of error is overruled.

## IV

The fourth assignment of error is that the verdict is against the weight of the evidence. Defendant argues that the state failed to provide any evidence of motive, he questions the credibility of the witnesses, and he maintains that no reasonable juror could have convicted when no physical evidence tied him to the crime.

■ The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus. Assessing factors such as motive and physical evidence is particularly within the province of the jury, and a reviewing court will not substitute its judgment for that of the trier of fact. *State v. Waddy* (1992), 63 Ohio St.3d 424, 588 N.E.2d 819.

■ Defendant gave conflicting statements on whether decedent struck him at the bar. He originally said that decedent did not cause the fight, although he later told the police that the day after the fight he spoke to decedent and asked why decedent started the fight. The defense raised the possibility that the fight had been gang-related, and other testimony suggested that defendant wished to retaliate, saying he "had to do something."

■ Of course, the state has no obligation to prove motive in any case, although the existence of a motive may go far towards explaining an offense or placing certain actions in context. The possibility that the murder had been gang-related would have explained the brazen manner in which defendant carried

out the act, and further would have explained his statements to the two men near the scene that they should "[g]o check your boy, you'll see what happened" and "I just popped your nigger, go see."

Defendant argues that the two witnesses near the scene lacked credibility because they testified that defendant said two different things. We do not find this fact troubling. Their recollection of defendant's statements may not have been precise, but they were not inconsistent in context. In any event, the jury is entitled to believe or disbelieve the testimony of the state's witnesses and/or the defense witnesses. *State v. Antill* (1964), 176 Ohio St. 61, 26 O.O.2d 366, 197 N.E.2d 548.

Finally, the lack of physical evidence does not bar this conviction. Defendant admitted being near the scene of the crime. The coroner testified that the fatal shot had been fired from very close range with a 9 mm handgun, clearly implying the perpetrator's intent to kill. The two witnesses near the scene both testified that they saw defendant carrying a similar weapon. Although the police did not find any bloodstained clothes belonging to defendant, they did not arrest him until five days after the murder, so defendant would have been able to dispose of any bloodstained clothes. Given the nature of this evidence, we do not conclude that the jury lost its way in rendering the verdict. The fourth assignment of error is overruled.

*Judgment affirmed.*

PATRICIA ANN BLACKMON, P.J., and PORTER, J., concur.